# Wytheville

## I. N. WADE v. LETTLER H. PEEBLES.

June 14, 1934.

Present, Holt, Epes, Hudgins, Gregory, Browning and Chinn, JJ.

The opinion states the case.

*S. Burnell Bragg,* for the plaintiff in error.

*Q. C. Davis, Jr.,* and *Herman A. Sacks,* for the defendant in error.

Epes, J., delivered the opinion of the court.

This is an action instituted by a notice of motion for judgment by Mrs. Lettler H. Peebles against I. N. Wade to recover damages for personal injuries which she al-

leges she suffered as the result of an automobile collision caused by the negligence of Wade.

There were two trials of the case. On the first trial, held March 4, 1932, the jury returned a verdict for the plaintiff for $2,750. The defendant moved the court to set the verdict aside and grant him a new trial on the following grounds: (1) "The verdict is contrary to the law and the evidence." (2) "The plaintiff failed to prove by a preponderance of the evidence that her injuries were caused by the negligence of the defendant." (3) "The verdict was grossly excessive." (4) "The verdict plainly shows that the jury was actuated by sympathy, prejudice and partiality, or that they were misled by some mistaken view of the merits of the case."

On May 14, 1932, the court, in ruling on this motion, entered an order which reads as follows:

"The court having fully heard and considered the motion of the defendant to set aside the verdict of the jury in this case and grant him a new trial, doth sustain the same as to the amount of damages awarded the plaintiff, and doth grant a new trial for the purpose of the jury to assess the damages in this case; to which action of the court in refusing to set aside the verdict of the jury and enter judgment for the defendant, the defendant, by counsel excepted; and to which action of the court in setting aside the verdict of the jury and granting a new trial in order for the jury to assess the damages, the plaintiff, by counsel, excepted."

The evidence introduced at the first trial was not made a part of the record.

On the second trial, held May 31, 1932, after the jury had been sworn and before counsel made their opening statements, the court made the following statement to the jury:

"The court: You understand you are not trying as to whose negligence was the proximate cause of this automobile accident; you are merely trying the amount of damages that the negligence of the defendant was the

proximate cause of. * * * It has been decided that the defendant's negligence was the cause of the accident. The only thing is the amount of damages.

"Mr. Bragg [counsel for defendant]: I understand that the jury is to decide * * * whether or not this accident brought about the abortion that the lady suffered.

"The court: The only thing is, it has been decided that the negligence of the defendant was the proximate cause of the accident. The question is what damages resulted to the plaintiff from that.

"Mr. Bragg: If any.

"The court: That is the question.

"Mr. Davis [counsel for plaintiff]: In other words, the jury is to fix the amount of damages as the result of the accident.

"The court: The whole question of damages comes up."

While counsel for plaintiff was making his opening statement this occurred:

"Mr. Davis: His honor has told you that the liability of this has already been established and fixed, that the proximate cause of her injuries is the negligence of Mr. Wade, the defendant, and it is your duty to say—

"Mr. Bragg (interposing): Your honor has not said that. That is for the jury to decide—the proximate cause.

"The court: I think that is perfectly plain. It has been decided that the negligence of Mr. Wade was the proximate cause of the accident. It is the duty of the jury to decide what damages came to plaintiff as the consequence of that act.

"Mr. Bragg: Yes, sir, that is right."

So far as it need be stated, the evidence introduced on the second trial was as follows:

The collision occurred Sunday, July 5, 1931, at the intersection of Jackson and Ohio streets in the city of South Norfolk. One of the cars, which was being driven by Mrs. Peebles' husband, was going south on Jackson street. The other, driven by Wade, was going east on Ohio street. Mrs. Peebles was sitting on the front seat of their car

between her husband and a Miss Franklin. The right side of Wade's front fender struck the right rear wheel of Peebles' car. It crushed its right rear fender, and turned it around in the street, but did not turn it over. According to the evidence for the plaintiff both cars were runnning between fifteen and eighteen miles an hour when they collided. Wade testified that the speed of each car had been reduced to about ten miles an hour before the impact occurred. Mr. Peebles was not injured in any way, and the inference from the evidence is that Wade was not hurt. Miss Franklin received a cut over her eye. The evidence with reference to Mrs. Peebles' injuries follows:

Mrs. Peebles' testimony is this: When the cars collided "I was jammed between Miss Franklin and Mr. Peebles. At the time I was stunned and I didn't know how I felt. I was taken from the scene of the accident to Dr. Chapman's office. When I got there I was hysterical and nervous, and I began to have pain * * * in my back and through my shoulders and through my abdomen. From his office I was taken to Miss Franklin's home. From there I was taken to my home and put to bed, and was confined to my bed about a month. I did not receive a scratch or a scar that I know of; but I was pregnant and on the Thursday following the accident I had an abortion. I had missed my menstrual period which should have occurred about three weeks before the accident. I had never had an abortion, but I had given birth to a child about two years before; and from past experience I am sure I was pregnant and I am sure I had an abortion. I did not see the foetus. I was so ill I didn't know what was going on. I had been suffering with nausea before the accident, started to vomiting after the accident, and continued to vomit up to the time of the miscarriage. After that I was too sick to know what I did. About fourteen months before my child was born I was operated on for a female trouble, but that had nothing to do with this case. Also before my child was born I suffered from a

stricture of the ureter, but have not suffered from that trouble since the birth of my child. The accident has completely wrecked my nerves. Before that time I did all my housework even to my baby's laundry and took care of the baby, and drove an automobile whenever I wanted to go but I don't drive a car any more. Since that time I have not been able to do any work and have had to keep a servant. I have not been able to care for my baby, and lots of times I have to send baby away from home because I am so nervous. Now if I do the least work or lift my baby or things like that, I suffer with my back and shoulders, and I suffer all the time with my head. I have headaches and my head pains me. Before the accident I weighed from 115 to 118 pounds and had no trouble in sleeping. I now weigh only ninety-four pounds and lots of nights I have to take things to make me sleep. Before the accident I had no trouble at my menstrual periods. Now every month I suffer so I have to go to bed for two or three days."

Several other witnesses introduced by the plaintiff corroborated her statements with reference to the state of her health and physical strength before and after the accident.

Dr. I. L. Chapman, a witness for the plaintiff, testified as follows: "I have been Mrs. Peebles regular physician for over ten years. About two weeks before the accident she came to me and told me that she had gone a week past her regular period without menstruating, and that she was having some nausea in the morning and whenever she smelled food. I made no examination for her, but told her that in my judgment, with the history of the past, she was pregnant. I could have made an examination to determine whether she was pregnant, but I did not. At that early stage it is hard to tell. At a week's pregnancy I couldn't be absolutely sure. When she came to my office just after the accident she was extremely nervous and upset, and complained of some little pain in her shoulder and back, and *thought* she was

not hurt much. I told her to go home and go to bed. So far as I could observe she showed no signs of having received any external injuries. I saw her again that night. She was then extremely nervous, crying out when cars went by or put on brakes heavily, or when street cars went by turning the corner and would squeak she would jump almost clear of the bed. Her nausea was worse that afternoon and night, and I think that she vomited that night and the next day. I gave her sedatives that afternoon and night; and the next day or so after the accident I began to give her glucose intravenously because she was nauseated, and I wanted to try and stop the vomiting, so she would not bring on the abortion. To the best of my judgment she had an abortion on Thursday following the accident. I should say that it was the result of the shock and nervous condition; that it was brought on by the shock more than any real trauma or injury to the body itself. The nausea and vomiting continued after Thursday for several days, the rest of that week, I think; and she continued to flow for some little time after the abortion, but she cleared herself in the proper time, I think. She was run down and sore from the nausea, and when the temperature would rise she would get sick at the stomach and was terribly nervous and upset. I kept her in bed some time. She was in bed I should say off and on for at least a month. I have treated her professionally off and on ever since the accident. She is still quite nervous but very much better than she was, but far different than what she was before the accident. She still has some pain in the shoulders and back in rainy, changeable weather, and complains of some weakness in the back or pain when she works or does any more than the very lightest labor. From the time of the birth of her baby until the accident she was enjoying better health than at any time since I had known her. Previous to the birth of her baby she had some trouble with her kidneys, but since the birth of her

baby she had not had any trouble with her kidneys, kidney colic, or pus in her urine."

Upon cross-examination Dr. Chapman was asked, and answered, these questions:

"Q. There is no way in the world that you can tell the jury that she had an abortion, is there?

"A. There is no way I can tell them absolutely and neither is there any other way that other men can say that she had not.

"Q. There is no way that you can say to the jury that she had an abortion?

"A. No, but that is the statement of a man of twenty-seven years' experience."

The plaintiff introduced Mrs. Jennie Jordan, a practical nurse of fourteen years' experience, but no hospital training, who had nursed between two and three hundred abortion cases during the last year. She was called in the day after the accident to give Mrs. Peebles glucose and bromides in her bowels, and saw her four times that day and "was seeing her approximately two weeks, a part of the time four times a day and then twice a day, and later on once a day to give her this treatment." After having testified on her direct examination that Mrs. Peebles had an abortion on Thursday morning after the accident, she testified as follows on cross-examination:

"Q. How do you know that she had a miscarriage?

"A. I couldn't swear that she did. * * * But I am sure, from the births I handle and just what I do know about those things, I am sure that she did, but I didn't see it.

"Q. You didn't see any part of the foetus?

"A. No, sir.

"Q. So, unless you saw the foetus there is no way you could tell the jury that she had a miscarriage?

"A. As I say, I couldn't swear that she did, but the general odor and the flow that she had afterwards, and with those cases I handle I know that she did.

"Q. You say that you know that she did?

"A. I am sure that she did, * * * [but] I couldn't swear to it."

Doctor Andrews, a specialist in obstetrics and female diseases, was introduced as a witness for the plaintiff. He had been present and heard the testimony of Mrs. Peebles and Dr. Chapman. In a long hypothetical question, which fairly stated the facts testified to by Dr. Chapman and Mrs. Peebles, he was asked his opinion as to whether Mrs. Peebles had an abortion. He replied, "It would be my opinion that she had had an abortion, and, in the absence of any other reason for it, that the accident had caused it." He further testified that several years before he had operated on Mrs. Peebles for an ovarian cyst, and had treated her for an obstructed ureter and pus in her urine, or pyelitis; but that she had recovered from these troubles before her child was born.

On cross-examination Dr. Andrews further testified to this effect. There are many things which may cause a woman to have a delayed menstrual period, and sometimes a woman goes three or four weeks past her regular time without menstruating, though she is not pregnant. When a woman has missed three weeks that is "presumptive" but you "can't tell much" by this. "A pelvic examination tells a little but not much" in the early stages of pregnancy. The only certain way to tell whether a woman is pregnant, when it has been only three or four weeks since she has conceived, is to use the Ashiemzondk urine test, or a modification of it; and it is not an absolute test, as it fails in about ten per cent of the cases in which it is applied. (This test was not used in this case.) "The first possible evidence one can get with the hands is when the baby is big enough to move, and that is about six or five months possibly."

"Q. So from the * * * time that she has conceived until five months, there is no way for a physician to determine whether she is pregnant except by making the test?

"A. We can have an opinion about it. I was asked for

an opinion, I understand. There is no way we can prove it."

When asked whether a "slight jar, as described here of this accident" would cause a healthy woman to have an abortion, he replied: "You ask a question I can't answer. * * * There are people who want to bring abortions on themselves and do almost everything in the world [without producing abortion], and there are others who are anxious to carry it, and the slightest misstep will bring it on."

Dr. G. B. Byrd and Dr. R. M. Cox, both of whom specialize in obstetrics, were introduced as witnesses for the defendant.

Dr. Byrd testified that there is no way in which either a woman herself or a doctor can tell with any degree of certainty whether she is pregnant or not when she has missed her period for only three weeks, except by the test mentioned by Dr. Andrews; and that he knew of no way in which a doctor could say that a woman who had missed her period for only three weeks had had an abortion, unless he saw the foetus or made "a microscopic examination of some of the tissue expelled from the uterus. You should be able to find the embrionic pregnancy in the tissues." He further testified that a woman who has an abortion should get over it as over any other pregnancy; and if the abortion is complete he "could see no reason for her health to be affected" by it.

Dr. Cox testified that he had heard the testimony given by Mrs. Peebles, Dr. Chapman and Mrs. Jordan, and the testimony of the plaintiff's witness as to "the severity of the impact" between the automobiles. He said that after a careful examination of the testimony which had been given he was of the opinion that she did not have an abortion and was not pregnant. That Mrs. Peebles had gone three weeks past her regular period without menstruating and was suffering from some nausea is not sufficient to show that she was pregnant. He agreed with Dr. Andrews and Dr. Byrd that the Ashiemzondk test, or some modifi-

cation of it, is the only way in which it is possible to tell with certainty that a woman is pregnant in the early stages of pregnancy; and says further "it would be most unusual for such an impact as that seems to me to be from hearing it described * * * to bring on an abortion."

The defendant Wade testified in part as follows:

"Q. Did you inquire whether she [Mrs. Peebles] was injured in any way?

"A. The first thing I asked, when she got out of the car, was if there was anything wrong, and she said 'No.' She walked up the steps and met Miss Franklin at the door.

"Q. Did she appear to be normal when you took her to Dr. Chapman's office from the scene of the accident?

"A. She seemed to be a little excited about it.

"Q. Had the excitement worn off from the time she went from Dr. Chapman's to Miss Franklin's?

"A. I can't say it had."

At the conclusion of the evidence in chief for the plaintiff the defendant moved the court to strike out all the plaintiff's evidence on the ground "that the plaintiff has wholly failed to prove that she was pregnant, or that this accident brought about an abortion." The court overruled the motion, and the defendant excepted. The court gave the jury the following instructions:

Plaintiff's instruction A: "The court instructs the jury that in ascertaining the amount of damages that are reasonable and fair to be awarded to the plaintiff, Lettler H. Peebles, under the circumstances of this case, as compensation for the injuries she sustained, you can take into consideration all the injuries you believe from the evidence she received from the said accident, and all mental and bodily pain and suffering she had had to endure as a consequence of said injuries.

"And if you further believe from the evidence that she has not fully recovered from said injuries, and that she still suffers from them, and will continue to do so, then you may also take into consideration, in assessing damages, such pain, suffering and inconvenience as you be-

lieve from the evidence will naturally, reasonably and probably result to her in the future as a consequence of the injuries."

Plaintiff's instruction No. 4: "The court instructs the jury that it has been heretofore established that the accident was due to the negligence of the defendant; that they must now consider what damages must be awarded for the injuries, if any, which it has been shown by the preponderance of the evidence were caused by said accident."

Defendant's instruction No. 1: "The court instructs the jury that the basis of this suit is that the defendant's negligence caused the injuries complained of. You cannot infer that her injuries were caused by the defendant's negligence from the mere fact that the accident occurred. On the contrary, the presumption is that her said injuries were not caused from this accident *unless and until the contrary is proven.* (Italics ours.)

"The burden of proving this case by a preponderance of the evidence rests upon the plaintiff throughout the whole case and applies at every stage thereof, and unless you believe from the evidence that the plaintiff has sustained that burden you must find for the defendant.

"If you believe from the evidence that she received no injuries or the miscarriage or abortion might have been caused by poor health, or in any other manner, or from any other cause, other than from the accident, or that she received no injuries, then you must find a verdict for the defendant.

"If, after hearing all the evidence, you are doubtful as to whether or not she received any injuries, or that the miscarriage or abortion was caused by the accident, and you believe it is just as probable that she received no injuries or the miscarriage or abortion was not caused by the accident as that it was, then you must find for the defendant."

Defendant's instruction F: "The court instructs the jury

that there is no evidence of permanent injury to Mrs. Peebles."

The defendant by counsel objected to the giving of plaintiff's instruction A, saying: "I object and except to the granting of instruction A asked for by the plaintiff in that the court tells the jury 'in ascertaining the amount of damages that are reasonable and fair to be awarded the plaintiff.' The wording of this instruction is misleading and will * * * lead the jury to believe that the court expects the jury to find for the plaintiff."

As tendered by the defendant his instruction No. 1 did not contain the words which we have italicized. These words were inserted by the court over the objection of the defendant.

The court refused to give instruction 3-D requested by the defendant, which, so far as it need be quoted here, reads:

" * * * If you believe from the evidence that Mr. Peebles, in driving his car, did not use reasonable care and precaution for the safety of the occupants of his car while driving along Jackson street, and that such omission on the part of Mr. Peebles was the sole cause of the accident, then you should find for the defendant."

After the arguments had been concluded and the jury was preparing to retire counsel for the defendant suggested to the court "privately" that the clerk tear from the cover of the notice of motion for judgment on which the verdict of the jury at the former trial had been written, or that the court give the jury another paper on which to write their verdict. The court refused to do as counsel requested, but it took the notice of motion for judgment, folded it so that the former verdict could not be seen, put a paper clip and a rubber band on it, and "stated to the jury that the court would give them this paper with instructions not to open it and read what was on the inside [and] that he felt he could trust the jury to that extent."

The record also contains this statement with reference

to what occurred just before the jury retired: "Before the jury left the box the court again stated that it had been decided that the negligence of the defendant was the proximate cause of the accident; the question before them was how much the plaintiff was to recover in damages. To this statement, made by the court to the jury, the defendant's attorneys again objected and excepted."

The jury returned a verdict for the plaintiff for $2,750.

The defendant moved the court to set the verdict aside and grant him a new trial on the following grounds: (1) "The verdict was contrary to the law and the evidence." (2) "The verdict was against the weight of the evidence and without evidence to support it." (3) "The plaintiff failed to prove by a preponderance of the evidence that her injuries were caused by the accident between the automobiles or the negligence of the defendant." (4) "The verdict was grossly excessive." (5) "The court erred in refusing to permit the attorney for the defendant to properly cross-examine Dr. Chapman or [on] his evidence given at a former trial of this case." (6) "The verdict plainly shows that the jury was actuated by sympathy, prejudice and partiality or that they were misled by some mistaken view of the merits of the case." (7) "The court improperly stated to the jury before the trial began that they were not to consider the liability of the defendant, for that had been fixed, and that they were only to consider the amount of damages which the plaintiff should receive." (8) "The court erred in refusing to grant instructions offered by the defendant and in granting instructions offered by the plaintiff which were objected to by the defendant." (9) "The court improperly instructed the jury orally, in that he again stated to the jury that they were not to consider the liability of the defendant for the cause of this accident; that that had already been established and that they were only to consider the amount of damages which they thought the plaintiff ought to recover and he failed to state to the jury that they could find a verdict for the plaintiff and refuse to give

her any damages." (10) "The court erred in its action in permitting the jury to take to the jury room the cover of the notice of motion for judgment on which the former verdict was written." (11) "The court erred in again telling the jury, as they left the jury box to consider this case, that the liability of the defendant had been fixed and the only question before them was the amount of damages which the plaintiff should recover." (12) "The court erred in overruling the motion to strike out the plaintiff's evidence."

The order entered by the court reads as follows:

"This day came again the parties by their attorneys, and the court having fully heard the motion of the defendant to set aside the verdict of the jury in this case and grant him a new trial, is of the opinion that the verdict of the jury is excessive, doth put the plaintiff on terms to accept fifteen hundred dollars ($1,500) with interest thereon from the 9th day of July, 1932, until paid, and the defendant is required to pay to the said plaintiff, his costs by him in this behalf expended; to which action of the court in reducing the amount of damages as awarded by the jury and refusing to enter judgment upon said verdict, the plaintiff by counsel, excepted; and to the action of the court in entering judgment for the plaintiff, the defendant by counsel, excepted." This is the judgment to which the writ of error was granted.

The plaintiff accepted under protest the remission of $1,250 of the verdict imposed upon her by the court, but excepted to the action of the court putting her on terms to do so.

The plaintiff in error thus states his assignments of error: "It is respectfully submitted that the trial judge erred in refusing to set aside the verdict of the jury and grant your petitioner a new trial for the following reasons:" He then states identically the same twelve grounds on which he had moved the court to set the verdict aside.

The defendant in error assigns as cross-error the action of the court in putting her on terms to accept a reduction

of the verdict from $2,750 to $1,500. (See section 6335, Code Va. 1919.)

We are of opinion that none of the grounds on which the defendant moved the court to set aside the verdict and grant him a new trial were well laid.

■ The evidence is far from being conclusive that Mrs. Peebles was pregnant and did have an abortion. But there was sufficient evidence to make this and the question whether, if she did have an abortion, it was proximately caused by the collision, questions for the jury; and the court fairly submitted these questions to the jury by giving defendant's instruction No. 1.

■ However, if it be assumed that Mrs. Peebles was not pregnant and did not have an abortion, the testimony introduced by the plaintiff, if believed, shows convincingly that she received a very substantial nervous shock as a direct result of the collision and was made ill thereby. There is no evidence which substantially contradicts or conflicts with this testimony, or which is sufficient to cast suspicion or doubt upon its verity and to have warranted the jury in disbelieving it. Her reply to Wade's question as she got out of the automobile is not sufficient to have done so. For this reason, though plaintiff's instruction A and some of the statements made by the court to the jury do carry the implication that the court expected the jury to return a verdict for the plaintiff for some amount, the fact that they carried this implication did not constitute error.

■■ The objection made by the defendant to the modification made by the court in his instruction No. 1 is fundamentally unsound. The burden rested upon the plaintiff to prove that she had received injuries and that these injuries were proximately caused by the collision. But there was no presumption either that she had or had not suffered injuries, or that any injuries which she had suffered were or were not proximately caused by the collision. Had the court given the instruction without

modifying it in some such way as it did, it would have committed error.

■ The evidence on the first trial was not made a part of the record, and the plaintiff in error is precluded from raising any question as to the correctness of the action of the court in granting him a new trial only "for the purpose of the jury to assess the damages;" and that order stands unassailable. This being true, the defendant is plainly not entitled to complain of the refusal of the court to give instruction 3-D, or of the statements made by the court to the jury limiting the issue to the amount of the damages suffered by the plaintiff from injuries which were proximately caused by the collision.

■ The question of whether the verdict of the jury was excessive must be considered on the assumption that Mrs. Peebles was pregnant and did have an abortion, and that her testimony with reference to her illness and subsequent disabilities is true. Accepting this as true, we are of opinion that the court erred in putting the plaintiff on terms to accept a verdict for $1,500.

■■ In cases of this nature this language of Daniel, J., in *Farish & Co.* v. *Reigle,* 11 Gratt. (52 Va.) 697, 722, 62 Am. Dec. 666, is peculiarly apt: "There is no rule of law fixing the measure of damages in such a case, and it cannot be reached by any process of computation. In cases of the kind, the judgment of the jury must govern, unless the damages are so excessive as to warrant the belief that the jury must have been influenced by partiality or prejudice, or have been misled by some mistaken view of the merits of the case." We are of opinion that the verdict is not so large that it can be said that its size shows that the jury were influenced by partiality or prejudice, or by any misconception of the merits of the case, or to indicate that it was moved to its conclusion from something other than a sense of right and justice; and we find nothing else in the record which tends in any way to show that it was. (For a collection of cases involving a miscarriage in which it was held that the verdict was not so great as to warrant

the court in setting it aside, see note 46 A. L. R. 1398, and 17 C. J. p. 1117, note 25.)

The court may have erred in setting aside the first verdict on the ground that it was excessive; but if so, the defendant cannot complain of it. If error was committed there, it was error which he invited. Further, as the evidence on the first trial is not made a part of the record it is a point upon which we cannot pass.

Perhaps it would have been better for the court to have so handled the matter that a paper upon which the verdict found at the first trial was recorded should not have been sent to the jury room. But the court did not commit reversible error in pursuing the course which it pursued with reference to this matter. Further, it instructed the jury not to unfold the paper and read what was written under the fold, and we cannot presume that the jury disobeyed this instruction without anything to show that it did.

The fifth ground upon which the defendant moved the court to set aside the verdict is this: During his cross-examination of Dr. Chapman counsel for defendant several times attempted to cross-examine him as to statements he had made on the former trial. He would begin his question, "I asked you this question," and then, stating that he was "reading from the evidence you gave March 4, 1932," would read a question and answer. The court refused to permit him to do this, saying, "You can't read the testimony taken before. You have a perfect right, when the witness makes a statement, to ask if on a former occasion he did not make this statement or that statement, but you cannot read that evidence in this case." The court was correct in that ruling. Counsel was in effect testifying as to what the witness had said at the former trial, under the guise of asking him a question, though he may not have realized it.

That the final determination of this case may not be delayed more than can be avoided, we have considered and expressed our opinion upon the several issues raised

in the petition for a writ of error and by the defendant's. assignment of cross-error. But in the final analysis the writ of error will have to be dismissed as having been im-providently awarded, because no final judgment has been entered in this case except for costs; and for the same reason no judgment can be entered in response to the assignment of cross-error.

In an action at law a writ of error does not lie· until a final judgment has been entered in the case by the court below, even though the court may have entered an order which indicates clearly what its final judgment would have been had it entered a final judgment. Section 6336, Code Va. 1919; *Salem Loan, etc., Co.* v. *Kelsey,* 115 Va. 382, 79 S. E. 329; *Brown* v. *Carolina, etc., R. Co.,* 116· Va. 597, 83 S. E. 981. In this connection see, also, sections 6333 and 6334. Though section 6335 authorizes the re-view upon a writ of error of "the judgment" of the court putting a plaintiff on terms to remit a part of the verdict returned in his favor, it does not authorize such review until final judgment has been entered for him.

The writ of error will be dismissed as having been im-providently awarded and the case remanded to the trial court that final judgment may be entered therein by it.

> *Writ of error dismissed as hav-ing been improvidently awarded.*